**CLOSED**

**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| _____ : | |
| VASKAR BISWAS, : | |
| : | Civil Action No. 04-3503 (JAP) |
| Plaintiff, : | |
| : | |
| v. : | **OPINION** |
| : | |
| COMMISSIONER OF SOCIAL : | |
| SECURITY, : | |
| : | |
| Defendant. : | |
| _____ : | |

Appearances:

JAMES LANGTON
ABRAHAM S. ALTER
Langton & Alter, Esquires
2096 St. Georges Avenue
P.O. Box 1798
Rahway, NJ 07065
     Attorneys for Plaintiff


CHRISTOPHER J. CHRISTIE
United States Attorney
ANDREEA L. LECHLEITNER
Special Assistant U.S. Attorney
c/o Social Security Administration
26 Federal Plaza, Room 3904
New York, NY 10278-0004
     Attorneys for Defendant

PISANO, District Judge:

Before the Court is Vaskar Biswas' ("Biswas," the "Plaintiff," or the "Claimant") appeal from the Commissioner of the Social Security Administration's ("Commissioner") final decision denying his request for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  The Court has jurisdiction to review this matter under 42 U.S.C. §§ 405(g) and 1383(c)(3) and decides this matter without oral argument.  *See* Fed. R. Civ. P. 78.  The record provides substantial evidence supporting the Commissioner's decision that Plaintiff was not disabled.  Accordingly, the Court affirms.

## I.  BACKGROUND

Plaintiff, born 1956 in Bangladesh, appears to have a twelfth grade education and worked primarily as a limousine driver.[1]  (R. 240).[2]  He asserts that he was disabled for a closed period extending from September 27, 2001 to February 17, 2003.[3]

### A.  Procedural History

Plaintiff Biswas filed initial applications for DIB and SSI on October 9, 2001, alleging

---

[1] While the Disability Report completed and signed by Biswas indicates that Biswas has a twelfth grade education (R. at 66), a report for the Division of Disability Determination Services completed by Celia G. Roque, M.D. notes that Biswas had completed two years of college (R. 240) and a report for the Division of Disability Determination Services completed by Francky Merlin, M.D. notes that Biswas has a tenth grade education (R. 245).

[2] "R." refers to the certified copy of the transcript of the record of proceedings relating to this matter filed by the Commissioner of Social Security.

[3] Some apparent confusion has existed as to the end of the alleged period of disability. Biswas asserts that he was disabled until February 17, 2003.  ALJ Determan considered a period ending at October 31, 2003.  Because the ALJ evaluated Biswas' petition for a closed period of disability for a period greater than and encompassing the period alleged by Biswas, Biswas suffered no prejudice by this inconsistency.

disability as of September 27, 2001.[4]   (R. 48-51, 260-262).[5]  Plaintiff's applications were denied

on initial review on March 6, 2002 (R. at 21-26), and on reconsideration on October 17, 2002 (R.

at 31-33).  On October 22, 2002, Plaintiff sought review of the denial of his applications by an

administrative law judge ("ALJ"), requesting a hearing before the ALJ and indicating that he

wished to appear at the hearing.  (R. at 34).  The Honorable Dean W. Determan, ALJ, was

assigned to review Plaintiff's claims.  While a hearing was initially scheduled for June 16, 2003

(R. at 36-40), the record does not evidence that any hearing took place on that date.  Plaintiff by

his counsel wrote to ALJ Determan on July 25, 2003, referencing a prior communication with

ALJ Determan:  "Pursuant to our earlier conversation please accept this letter memorandum in

lieu of a more formal brief in support of the above captioned claimant's claim for disability."  (R.

at 41-42).  Thereafter, a hearing was scheduled again for October 1, 2003.[6]  ALJ Determan issued

---

[4] Defendant's brief refers to the "alleged onset date of disability" as September 1, 2001. (Defendant's Brief Pursuant to Local Civil Rule 9.1 at 1 (hereinafter, "Deft.'s Br.")).  Moreover, the administrative record contains suggestions that Plaintiff was first bothered by or became unable to work because of his "illnesses, injuries or conditions" on September 1, 2001 (*See, e.g.,* R. at 59-68 (Disability Report Adult)).  However, Plaintiff's brief and his Complaint allege that Plaintiff became disabled as of September 27, 2001.  (Brief in Support of Plaintiff Vaskar Biswas at 1; Complaint at ¶6, Wherefore ¶2).  As noted above, Plaintiff's initial applications for both DIB and SSI also represent that Plaintiff's disability began as of September 27, 2001.  (R. 48-51, 260-262).  In addition, in a July 25, 2003 letter to the administrative law judge reviewing his claim, Plaintiff through his counsel stated that the period for which he sought DIB and SSI benefits extended from September 27, 2001 to February 17, 2001.  While the Court notes this inconsistency, the difference between September 1, 2001 and September 27, 2001 ultimately is without consequence to this Court's review.  The Court will refer to September 27, 2001 – the alleged date of disability set forth in the Plaintiff's initial applications for benefits and in the Plaintiff's letter memorandum to the administrative law judge – as the alleged onset date.

[5] "R." refers to the administrative record filed as part of the Commissioner's answer.

[6] As discussed below, Plaintiff's brief states that "A hearing was held on October 1, 2003 before ALJ Dean W. Determan."  (Brief in Support of Plaintiff Vaskar Biswas at 1 (hereinafter referred to as "Pltf.'s Br.")).  However, ALJ Determan's opinion, dated October 31, 2001, specifically states:  "The claimant elected to have a decision made on the evidence in the record

an opinion on October 31, 2003 denying Plaintiff's application.  (R. at 10-18).  Plaintiff sought review by the Social Security Administration's Appeals Counsel, which on May 28, 2004 found "no reason under [its] rules to review the Administrative Law Judge's decision" and "[t]herefore,...denied [Plaintiff's] request for review."  (R. at 5-8).  Upon that denial, the ALJ's ruling became the SSA Commissioner's final decision.  Plaintiff thereafter commenced an action before this Court on July 23, 2004 challenging the final decision of the SSA Commissioner.

### B.  Factual History

Vaskar Biswas was born in Bangladesh on March 27, 1956 and moved to the United States in 1983.  (R. at 48, 260, 215).  He is a naturalized U.S. citizen.  He has at least a twelfth grade education.[7]  (R. at 66).  Biswas has been married to Sarmila Biswas since October 1992, and has two children.  (R. at 50, 260).  Biswas has lived in Fords, New Jersey, since approximately October 1996.  (R. at 260).  Biswas was employed as a limousine driver since at least 1995[8] until September 2001. (R. at 49).  In his capacity as a limousine driver, Biswas was required to lift suitcases.  In various questionnaires completed by Biswas, he indicated that the maximum weight he had to lift was either 50 or 100 pounds, and that he frequently was required to lift either 25 or 50 pounds.  (R. at 57, 61).  He alternatively indicated that he had to sit for about either twelve hours or four hours every days, and to walk, stand, and stoop for about one hour each every day.  (R. at 57, 61).  Prior to Biswas' employment as a limousine driver, he was

_____

without an oral hearing."  (R. at 13).

[7] *See* note 1 *supra*.

[8] The "Work History Report"completed by Biswas on October 25, 2001 and the "Disability Report Adult" completed by Biswas on October 9, 2001 report that he became employed as a limousine driver in October 1989.  (R. at 55-58, 59-69).  However, in the application for DIB completed by Biswas earlier that same month, he states that his employment with the limousine company began in February 1995.  (R. at 48-51).

employed as a restaurant busboy.  (R. at 55).  In his capacity as a busboy, Biswas frequently was

required to lift 10 pounds, and had to lift up to fifty pounds.  (R. at 56).  This position required

Biswas to walk for about three hours a day, to sit for about one hour per day, and to stand for

about two hours each day.  (R. at 56). On February 17, 2003, Biswas began working about 36

hours per week at a Catholic Charities homeless shelter.  (R. at 41-42).

Biswas made a claim for DIB and SSI on October 9, 2001, alleging an onset date of

September 27, 2001 in his applications.  (R. at 48, 260).  On that date Biswas was administered

an EKG and blood tests, and was admitted to Newark Beth Israel Medical Center ("Newark Beth

Israel").  (R. at 63, 65, 67, 98, 235).  Biswas had been transferred to Newark Beth Israel from the

Raritan Bay Medical Center, Perth Amboy Division of The Heart Hospital of New Jersey

("Raritan Bay").  (R. at 99-100).  Biswas had presented to Raritan Bay complaining of an supra-

auricular abscess seeking emergency care on September 14, 2001 and was admitted for 10 days.

(R. at 99, 203).  While at Raritan Bay, Biswas was diagnosed with an supra-auricular abscess

with cellulitis,[9] hypertension, and "Severe Aortic Insufficiency [and] Prosthetic valve Vegetation

aortic."[10]  (R. at 99, 203, 135, 215, 232).  Newark Beth Israel issued a preoperative diagnosis of

"Prosthetic Valve Dusfunction (*sic*.)", and noted that his symptom was "Congestive heart

failure."  (R. at 105).

On September 28, 2001, Biswas had open heart surgery to replace his aortic valve.  (R. at

63).  Biswas received a trans-esophageal echocardiography and an aortic valve replacement using

a 25 mmATS mechanical prosthesis.  (R. at 105, 108).  Newark Beth Israel gave Biswas a post-

[9] At Raritan Bay, Biswas's supra-auricular abscess was treated with drainage procedures
and antibiotics.  (R. at 219, 220, 231).

[10] Biswas suffered from rheumatic fever as a child, and had his aortic valve replaced in
1985.  (R. at 208, 212, 214).

4

operative diagnosis of "Same, there was structural deteriation (*sic.*) of the previously placed

bioprosthesis, there did not appear to be endocarditis." (R. at 105).  Biswas's hospital records

chart his recovery from surgery.  (R. at 142-60)

       Biswas was discharged from Newark Beth Israel on October 4, 2001.  (R. at 63, 160).

His Discharge Record indicates that his discharge instructions were to follow a "regular" diet and

that he was prohibited from heavy lifting, pushing, or pulling more than 10 pounds for six weeks.

(R. at 160).

       The record contains several medical reports.  In a December 18, 2001 Report of Contact,

Dr. S.M. Lewis recounted that Biswas had "endocarditis A. valve", and that his aortic valve had

been replaced with a prosthesis in September 2001.  (R. at 179).  Dr. Lewis also noted that

Biswas had suffered from rheumatic fever as a child and had his aortic valve replaced previously,

in 1985.  *Id.*

       Biswas's medical records indicate that he presented at Raritan Bay Medical Center's

outpatient center ("Raritan Outpatient") through January 2002.  (R. at 181-236).  The records

indicate that on January 4, 2002 Biswas informed Raritan Outpatient that he would be going to a

private physician.  (R. at 181).  On October 9, 2001, Biswas reported to Raritan Outpatient with

no complaints and indicating no pain. (R. at 188).  This assessment reports that his hypertension

was controlled and cites his rheumatic heart disease, endocarditis, peri-auricular abscess, and

aortic valve replacement. (R. at 189).  In a Field Office Disability report also completed on

October 9, 2001, Patricia Petrowski observed:  "No difficulties seen.  He conversed well,

memory good."  (R. at 71).  On December 4, 2001, Biswas presented at Raritan Outpatient

complaining of headache and itchiness at the site of his suture and seeking refill of his

medication.  (R. at 183).  The assessment reports that Biswas' hypertension was not well-

controlled and notes his aortic valve replacement and endocarditis.  (R. at 184).  The report notes

Biswas' medications and that he was vaccinated against influenza.  (R. at 184).  The records also

reflect that Rariton Outpatient attempted to contact Biswas via telephone on numerous occasions,

sometimes successfully, sometimes unsuccessfully.  (R. at 181-236).  With respect to one such

call, the notation for November 13, 2001 in the records maintained by Rariton Outpatient states:

"Spoke to wife and advised her to have pt. call clinic.  Pt. is working till 6 pm tonight...."  (R. at

186).

On February 22, 2002, Celia G. Roque, M.D. conducted a consultative examination of

Biswas.  (R. at 239-44).  Dr. Roque reported that Biswas' allegations were: "Status-Post Aortic

Valve Replacement, Hypertension and Pains of the Lower Extremities."  (R. at 239).  The report

also notes that Biswas "underwent an Aortic Valve Replacement with ATS mechanical valve

prosthesis" at Beth Israel Medical Center in Newark in September 2001, that Biswas'

hypertension, which had been diagnosed in 1985, was "currently under control" with

medications, and that Biswas was experiencing "aching pains on both legs... lasting for ten-

fifteen minutes...."  (R. at 239).  Dr. Roque reports that Biswas walked "to the exam with a

normal gait, without a handheld assistive device", was "not in acute distress", was "comfortably

seated during history taking and lying down on the exam table during physical exam, not

dyspneic or orthopneic, coherent, cooperative."  (R. at 240).  Significantly, Dr. Roque stated that

Biswas' heart "sounds good with mechanical click sound, regular rhythm, no murmur, no gallop,

no rub noted."  (R. at 240).  Dr. Roque noted laboratory findings including mild cardiomegaly,

no infiltrates, no pleural effusion, no congestive hart failure, "normal sinus rhythm, non-specific

intraventricular conduction delay, and T-wave abnormality possible lateral ischemia", and

"slightly elevated Total protein, Albumin, and SGPT, the rest of the chemistry within acceptable

limits."  (R. at 241; *see also* R. at 242-44).    Dr. Roque listed diagnostic impressions including:

"Status-Post Aortic Valve Replacement with Bioprosthesis Valve in 1985 due to Aortic Valve

Insufficiency"; "Status-Post Aortic Valve Replacement with Mechanical Valve Prosthesis,

September 2001 secondary to Aortic Valve Replacement Dysfunction"; and "Probable Peripheral

Arterial Disease of the Lower Extremities."  (R. at 240).  Dr. Roque concluded:

> This is a 45 year old male, a limousine driver until he was readmitted to the hospital
> in September 2001 where he underwent an Aortic Valve Replacement with
> mechanical valve prosthesis, due to malfunction of his first Aortic Valve
> Replacement with a valve bio-prosthesis done in 1985, due to Aortic Valve
> Insufficiency.  He has multiple subjective symptoms with unremarkable physical
> examinations.   He has physical functional limitations for activities requiring
> exertions.   He appears capable of performing activities of daily living and
> instrumental activities of daily living.  He was able to sit, stand, walk, hear, speak,
> read, write and travel.

(R. at 241).  Dr. Roque recommended that a resting arterial doppler study be conducted.  (R. at

241).

Biswas also completed a number of questionnaires regarding his medical status and his

work history.  (R. at 55-95).  In one questionnaire completed by Biswas on May 7, 2002, he

reported *inter alia*:  "I do very little.  I try to take a walk everyday.  I try to pick my children up

from school."; "I go to the grocery store with my wife.  I am unable to push the cart or carry the

groceries."; "I am no longer able to do yard work or make household repairs"; "I drive locally to

doctor's appointments and + to pick my children up from school."; "I watch T.V., play on the

computer and go to Temple to pray once a week for about one hour."  (R. at 79-82).  However,

Biswas also reported that while his walking was affected, he could still walk a distance of half a

mile, or for 10 to 12 minutes.  (R. at 79-82).  Biswas complained that "Every time I straighten my

back + shoulders to reach or lift something the tightness + itchiness at the site of my incision

increases." (R. at 79-82). Biswas reported that he was taking the medications Coumadin[11],

Hydrocholorothiazide[12] (*sic*.), Atenol[13] (*sic*.), and Enalapril[14] one or more times per day. (R. at

79-82). In a questionnaire completed on February 8, 2002, Biswas reported that he suffered from

chest discomfort, that he was unable to carry items weighing ten pounds because "it take[s his]

breath away", and that he could not drive for long periods because of headache and dizziness.

(R. at 86-88). Biswas indicated that he took the medications Hydrochlorothiazide, Atenolol, and

warfarin.[15] (R. at 87). Biswas also reported that he did not suffer from shortness of breath, that

he could perform the same household activities as he did before his illness and that he could

prepare meals, shop, take out the trash, and vacuum. (R. at 87-88). In another questionnaire,

---

[11] Coumadin is an anticoagulent "used to prevent and treat harmful blood clots. This medication helps to keep blood flowing smoothly in your body by decreasing the amount of clotting proteins in the blood." *See* http://my.webmd.com/drugs/drug-4069-Coumadin+Oral. aspx?drugid=4069&drugname=Coumadin+Oral.

[12]"Hydrochlorothiazide is a 'water pill' (diuretic) that increases the amount of urine you make, which causes your body to get rid of excess water. This drug is used to treat high blood pressure. Lowering high blood pressure helps prevent strokes, heart attacks, and kidney problems." *See* http://my.webmd.com/drugs/drug-5310-Hydrochlorothiazide+Oral.aspx?drugid= 5310&drugname=Hydrochlorothiazide+Oral.

[13] Atenolol "is a beta-blocker used to treat chest pain (angina) and high blood pressure. It is also used after an acute heart attack to improve survival. High blood pressure reduction helps prevent strokes, heart attacks and kidney problems." *See* http://my.webmd.com/drugs/drug-11035-Atenolol+Oral.aspx?drugid=11035&drugname=Atenolol+Oral.

[14] Enalapril "is used to treat high blood pressure (hypertension) in adults and children. It works by relaxing blood vessels, causing them to widen. Lowering high blood pressure helps prevent strokes, heart attacks and kidney problems. This medication is also used with other drugs (e.g., "water pills"/diuretics, digoxin) to treat congestive heart failure." *See* http://my.webmd.com/drugs/mono-3281-ENALAPRIL+MALEATE+-+ORAL.aspx?title=ENAL APRIL+MALEATE+-+ORAL.

[15] Warfarin is the generic name for the brand-name drug Coumadin. *See* http://my.webmd.com/content/pages/9/1675_57801.htm.

8

Biswas reported a number of changes in his abilities due to his illness, including changes to his abilities in the area of personal needs such as shaving, bathing, and dressing and changes to his abilities to get around by using public transportation.  (R. 89-93).  However, Biswas reported that he did not experience changes to his abilities in other areas, such as ability to eat or prepare meals, pay bills, use a checkbook, drive, buy groceries, shop for clothes, bank, go to the post office, do yard work, do laundry, do dishes and vacuum.  (R. 89-93).

        On September 11, 2002, Francky Merlin, M.D. conducted a consultative examination of Biswas.  (R. at 245-50).  Dr. Merlin reported that Biswas presented with "a chief complaint of high blood pressure." (R. at 245).  Dr. Merlin reviewed the history of Biswas' present illness, as well as his systems, past medical history, social history, family history, and laboratory test results.  (R. at 245-46).  A September 10, 2002 chest evaluation report attached to Dr. Merlin's report indicates that Biswas had an "essentially normal chest" aside from his "status post cardiac valve replacement."  (R. at 250).  With respect to the physical examination, Dr. Merlin reported in part: "Heart: Regular S1, S2.  There is a metallic click, no murmur, gallop or friction rub. Chest: Midline scar, pain on palpation of the anterior chest." (R. at 246).  In describing Biswas' musculoskeletal function, Dr. Merlin reported in part that:  "Patient has no difficulty getting up from the seated position or getting on and off the examining table.  There is full use of both hands and arms in dressing and undressing. Grasping strength and manipulative function are not impaired.  Patient is able to flex the spine forward 0-90 degrees and squat.  There is no joint pain, swelling or warmth."  (R. at 246).  Dr. Merlin's diagnosis was that Biswas had hypertension, but that it was controlled, and status post aortic valve replacement.  (R. at 246).  Dr. Merlin noted that Biswas "needs to follow-up with his cardiologist."  (R. at 246).  Dr. Merlin determined that Biswas was able to engage in the following work-related activities:  "Patient is able to sit, stand,

walk, handle objects, hear, speak, travel." (R. at 247).

A residual function capacity assessment was conducted by a state agency physician on March 4, 2002, and was reaffirmed by a different state agency physician on October 11, 2002. (R. at 251-58). This report states that Biswas can occasionally lift and/or carry a maximum of twenty pounds, frequently lift and/or carry a maximum of ten pounds, stand and/or walk for about six hours per day, sit for about six hours per day, and push or pull consistent with the foregoing limitations on lifting and carrying. (R. at 252). In support of these conclusions, the report notes *inter alia* that Biswas underwent a "successful re-replacement" of his aortic valve in "Sept/Oct 2001" and that Biswas had "no objective abnormalities"; "lungs [] clear"; "no arrythmia (*sic.*)"; "BP normal"; and "no peripheral edema." (R. at 252). The report notes that Biswas alleged "sternal (incisional chest pain)" and "SOB wo exertion." (R. at 252). The report indicates that Biswas could frequently engage in balancing, stopping, kneeling, crouching, or crawling, and occasionally engage in climbing of stairs, ramps, ladders, rope, or scaffolds. (R. at 254). Biswas also could engage in handling (gross manipulation), fingering (fine manipulation), and feeling (skin receptors) in an unlimited fashion, but that his ability to reach in all directions, including overhead, was limited. (R. at 253). The report found no limitations on Biswas' visual or communicative capacities. (R. at 254-55). As for environmental limitations, the only limitation affecting Biswas was the need to avoid concentrated exposure to extreme cold. (R. at 255).

## II.  LEGAL STANDARD FOR DISABILITY BENEFITS

### A.  Disability Defined

To be eligible for disability benefits and SSI benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable

10

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §

423(d)(1)(A); 42 U.S.C. § 1382(a)(3)(A).  A person is disabled for these purposes only if her

physical and mental impairments are "of such severity that [she] is not only unable to do [her]

previous work, but cannot, considering [her] age, education, and work experience, engage in any

other kind of substantial gainful work which exists in the national economy…"  42 U.S.C. §§

423(d)(2)(A), 1382c(a)(3)(A).

      **B.  The Five-Step Analysis for Determining Disability**

Social Security regulations set forth a five-step, sequential evaluation procedure to

determine whether a claimant is disabled.  20 C.F.R. § 404.1520.  For the first two steps, the

claimant must establish (1) that she has not engaged in "substantial gainful activity" since the

onset of her alleged disability, and (2) that she suffers from a "severe impairment" or

"combination of impairments."  20 C.F.R. § 404.1520(a)-(c).  Given that the claimant bears the

burden of establishing these first two requirements, her failure to meet this burden automatically

results in a denial of benefits, and the court's inquiry necessarily ends there.  *Bowen v. Yuckert*,

482 U.S. 137, 146-47 n. 5 (1987) (delineating the burdens of proof at each step of the disability

determination).

If the claimant satisfies his initial burdens, he must provide evidence that his impairment

is equal to or exceeds one of those impairments listed in Appendix 1 of the regulations ("Listing

of Impairments").  20 C.F.R. § 404.1520(d).  Upon such a showing, he is presumed to be

disabled and is automatically entitled to disability benefits.  *Id.*  If he cannot so demonstrate, the

benefit eligibility analysis requires further scrutiny.

The fourth step of the analysis focuses on whether the claimant's residual functional

capacity sufficiently permits him to resume his past relevant work.  20 C.F.R. § 404.1520(e)-(f).

Again, the burden lies with the claimant to show that he is unable to perform his past work.

*Fargnoli v. Halter*, 247 F.3d 34, 39 (3d Cir. 2001).  If the claimant is found to be capable to

return to his previous line of work, then he is not "disabled" and not entitled to disability.

benefits.  *Id*.  Should the claimant be unable to return to his previous work, the analysis proceeds

to step five.

At step five, the burden shifts to the Commissioner to demonstrate that the claimant can

perform other substantial, gainful work.  20 C.F.R. § 404.1520(f); *Kangas v. Bowen*, 823 F.2d

775, 777 (3d Cir. 1987).  If the Commissioner cannot satisfy this burden, the claimant is

"disabled" and will receive social security benefits.  *Yuckert*, 482 U.S. at 146-47 n.5.

### C. The Record Must Provide Objective, Medical Evidence

Under the Act, proof of a disability requires objective, medical evidence.  "An individual

shall not be considered to be under a disability unless he furnishes such medical and other

evidence of the existence thereof as the Secretary may require."  42 U.S.C. § 423(d)(5)(A).

Additionally, "[a]n individual's statement as to pain or other symptoms shall not alone be

conclusive evidence of disability as defined in this section."  *Id*.  Specifically, a finding that one

is disabled requires:

> medical signs and findings, established by medically acceptable clinical or laboratory
> diagnostic techniques, which show the existence of a medical impairment that results
> from anatomical, physiological, or psychological abnormalities which could
> reasonable be expected to produce the pain or other symptoms alleged and which,
> when considered with all evidence required to be furnished under this paragraph...
> would lead to a conclusion that the individual is under a disability.

*Id*.; *see* 42 U.S.C. § 1382c(a)(3)(A) (defining a disabled person as one who is "unable to engage

in any substantial gainful activity by reason of any medically determinable physical or mental

12

impairment . . ."). Furthermore, a claimant's symptoms, "such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect . . . [one's] ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present." 20 C.F.R. § 404.1529(b); *see Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999) (rejecting claimant's argument that ALJ failed to consider his subjective symptoms where ALJ made findings that complaints of pain and symptoms were inconsistent with objective medical evidence and claimant's hearing testimony); *Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992) (denying claimant benefits where claimant failed to proffer medical findings or signs that he was unable to work); *Green v. Schweiker*, 749 F.2d 1066, 1069-70 (3d Cir. 1984) (emphasizing that "subjective complaints of pain, without more, do not in themselves *constitute* disability").

## III. STANDARD OF REVIEW

The district court is vested with "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." Section 405(g) of the Act additionally provides that "the findings of the Commissioner of Social Security as to any fact, if supported by *substantial evidence*, shall be conclusive…" 42 U.S.C. § 405(g) (emphasis added), 42 U.S.C. § 1383(c)(3); *see also Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied sub nom. Williams v. Shalala*, 507 U.S. 924 (1993); *Stunkard v. Secretary of Health & Human Serv.*, 841 F.2d 57, 69 (3d. Cir. 1988). Accordingly, a reviewing court *must* uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *Williams*, 970 F.2d at 1178 (emphasis added).

"Substantial evidence" means more than "a mere scintilla." *Richardson v. Perales*, 402

U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

"Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion." *Id.*  The inquiry is not whether the reviewing court would have made

the same determination, but rather whether the Commissioner's conclusion was reasonable.

*Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988).  Thus, substantial evidence may be slightly

less than a preponderance.  *Stunkard v. Sec'y of Health & Human Servs.*, 841 F.2d 57, 59 (3d Cir.

1988).  Some types of evidence will not be "substantial."  For example,

> [a] single piece of evidence will not satisfy the substantiality test if the
> [Commissioner] ignores, or fails to resolve, a conflict created by countervailing
> evidence.  Nor is evidence substantial if it is overwhelmed by other evidence –
> particularly certain types of evidence (e.g. that offered by treating physicians) – or if
> it really constitutes not evidence but mere conclusion.

*Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (quoting *Kent v.*

*Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)).

   While a reviewing court shall give deference to administrative decisions, *see Schaudeck*

*v. Commissioner*, 181 F.3d 429, 431 (3d Cir. 1999), its "substantial evidence" review cannot be

fairly conducted without some indication that the ALJ has evaluated all the relevant evidence.

*Cotter v. Harris*, 642 F.2d 700, 705-06 (3d Cir. 1981).  Therefore, an administrative decision

should provide a "clear and satisfactory explanation of the basis on which it rests."  *Id.* at 704.

When the record shows conflicting evidence, the ALJ "must adequately explain in the record his

reasons for rejecting or discrediting competent evidence."  *Ogden v. Bowen*, 677 F. Supp. 273,

278 (M.D. Pa. 1987).  For instance, when an ALJ decides that a social security claimant is

capable of working, the ALJ must consider all evidence and explain the weight given to

probative exhibits.  *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978).

   Moreover, the reviewing court does have a duty to review the entire record to determine

14

whether the ALJ's findings are rational and supported by substantial evidence.  *See Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984).  In order to do so, "a court must 'take into account whatever in the record fairly detracts from its weight.'"  *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (quoting *Willibanks v. Sec'y of Health & Human Servs.*, 847 F.2d 301, 303 (6th Cir. 1988) (internal citation omitted).  The Commissioner has a corresponding duty to facilitate the court's review: "[w]here the [Commissioner] is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence."  *Ogden v. Bowen*, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing *Brewster v. Heckler*, 786 F.2d 581 (3d Cir. 1986)).  As the Third Circuit has held, access to the Commissioner's reasoning is indeed essential to a meaningful court review:

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978) (quoting *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977)).  Nevertheless, the district court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams*, 970 F.2d at 1182 (citing *Early v. Heckler*, 743 F.2d 1002, 1007 (3d Cir. 1984)).

## IV.  DISCUSSION

Biswas raises the following arguments in support of this appeal: (1) that the ALJ failed to hold a hearing in this matter in violation of Biswas' due process rights as well as regulations, (2) that the ALJ's analysis at the third step of the sequential evaluation was deficient, and (3) that the ALJ did not support his finding that Plaintiff could do sedentary work.  (Pltf.'s Br. at 9, 11, 17). In opposition, the Commissioner contends that the ALJ's decision is supported by substantial

evidence and should not be disturbed.  (Deft.'s Br. *passim*).  The Commissioner also argues that

Plaintiff admitted that he requested an on-the-record determination and, assuming *arguendo* an

improper waiver of a hearing, Plaintiff suffered no prejudice.  (Deft.'s Br. at 11-12).

### A.  Waiver of a Hearing

Plaintiff complains "that the ALJ did not hold a hearing in this matter" and argues that

"since no waiver of any kind was indicated by the plaintiff the ALJ's issuance of an unfavorable

decision represents a violation of the Regulations as well as plaintiff's due process rights."

(Pltf.'s Br. at 9-10).  In response, the Commissioner argues that, while the administrative record

does not contain Plaintiff's initial waiver, Plaintiff admitted that he requested an on the record

determination and that there is no evidence that the waiver was not knowing or voluntary.

(Deft.'s Br. at 11-12).  Moreover, the Commissioner argues that "there is no evidence that

plaintiff was prejudiced by waiving his right to a hearing."  (Deft.'s Br. at 12).

Due process requires "meaningful notice and an opportunity to be heard" prior to the

denial of a social security claimant's petition for disability benefits.  *Stoner v. Sec'y of Health

and Human Servs.*, 837 F.2d 759, 761 (6th Cir. 1988); *see also McCarthy v. Commissioner of

Social Security*, No. 95-CIV-4534 (JBS), 1999 WL 325017, *11 (D.N.J. May 19, 1999) ("[D]ue

process requires that a social security claimant be afforded a full and fair hearing.").  A claimant

may, however, waive the right to a hearing by "indicat[ing] in writing that [he or she] do[es] not

wish to appear before the administrative law judge at an oral hearing."  20 C.F.R. §§

404.948(b)(1)(I), 404.950(b), 416.1448(b)(1)(I), and 416.1450(b); *see also* Social Security

Ruling 79-19 (1979) ("SSR 79-19").  SSR 79-19 sets forth the requirements for a waiver of an

individual's right to appear at a hearing either in person or through a representative.  SSR 79-19

states: "An individual or the individual's authorized representative may waive the right to

personal appearance at a hearing only by a writing signed by the individual or the authorized representative...." SSR 79-19.  This writing must evidence six listed categories of information,[16] "which boil down to the fact that plaintiff knows how the procedures works, knows the purpose of appearing at the hearing, knows that the decision may be made on the written evidence and additional evidence obtained by the ALJ, and knows that he/she may withdraw the waiver up to the mailing of the decision." *McCarthy,* No. 95-CIV-4534(JBS), 1999 WL 325017, *12.  The express purpose of SSR 79-19 "is to ensure that such waivers are made voluntarily and knowingly; i.e., with knowledge of the advantage of personal appearance and the consequences of a waiver of the right to appear at the hearing." SSR 79-19; *see also McCarthy,* No. 95-CIV-4534(JBS), 1999 WL 325017, *12.

An agency is required to follow its own procedures.  *McCarthy,* No. 95-CIV-4534(JBS), 1999 WL 325017, *12.  Accordingly, the Court must determine whether the agency followed its own procedures, which as relevant to this matter include the above referenced regulations and

---

[16]  The six listed categories are:

1. a thorough explanation of the hearing procedure has been given;
2. the right to personal appearance at the hearing to testify and present evidence has been explained;
3. an explanation has been given of the right to representation at the hearing by an attorney or other person of the individual's choice;
4. it has been explained that, in some cases, additional evidence obtained thorough oral testimony and personal presence before the presiding officer may be of value in evaluating the issues;
5. the individual has been advised that, if he or she does not appear, the claim will be decided solely on the written evidence then in file plus any additional evidence submitted by the individual or the representative or obtained by the hearing officer.
6. the individual has been advised that he or she may withdraw the waiver of the right to appear at the hearing at any time prior to mailing of the notice of the decision.

SSR 79-19.

ruling.  *Id.*  If it did not, the Court must also determine "whether the failure to follow those

procedures prejudiced the plaintiff."  *Id.*  An "[i]nvalid waiver[] warrant[s] remand for a new

hearing *only if* the plaintiff suffered prejudice."  *Francisco v. Barnhart*, No. 01-CV-8657(SAS),

2003 WL 548870 (S.D.N.Y. Feb. 25, 2003) (emphasis added).

The facts relevant to Plaintiff's allegations concerning the sufficiency of waiver a hearing

are as follows.  On April 4, 2002, Plaintiff appointed his attorneys, James Langton and Abraham

S. Alter, to act as his representatives in connection with his claims for benefits under Title II and

Title XVI.  (R. at 27).  On the form requesting a hearing before an ALJ, dated October 22, 2002,

Plaintiff specifically checked off "I wish to appear at a hearing."  (R. at 34).  On April 1, 2003,

ALJ Determan sent Biswas a notice scheduling a hearing for June 16, 2003.  (R. at 36-39).  No

transcript of a hearing occurring on that date was included in the administrative record.

However, according to Plaintiff, Plaintiff's counsel, James Langton, did in fact appear before

ALJ Determan on that date.  (Pltf.'s Br. at 9).  In fact, Plaintiff asserts that "a lengthy discussion

was undertaken between plaintiff's counsel and the ALJ" during which Plaintiff through his

counsel moved for a closed period of disability, extending from the date of plaintiff's aortic valve

replacement surgery to the date Plaintiff began working at the Catholic Charities Homeless

Shelter, February 17, 2003.  (Pltf.'s Br. at 9).  On July 25, 2003, Plaintiff's counsel submitted a

letter brief to ALJ Determan in support of this request.  (R. at 41).  On August 12, 2003, ALJ

Determan sent Biswas a notice scheduling a hearing for October 1, 2003.  (R. at 43-46).   The

record contains no evidence that a hearing was conducted on that date, nor does Plaintiff allege

that he attempted to appear on that date in anticipation of a hearing before ALJ Determan.

Plaintiff executed an affidavit dated October 30, 2003, which Plaintiff's counsel asserts was hand

delivered to ALJ Determan's staff on October 31, 2003.  (R. at 283-84).  ALJ Determan issued

an opinion on October 31, 2003, concluding *inter alia* that Biswas was not disabled within the meaning of the Social Security Act and that Biswas was not entitled to DIB or SSI benefits. (R. at 13-18). In this opinion, ALJ Determan noted: "The claimant elected to have a decision made on the evidence in the record without an oral hearing." (R. at 13). On December 31, 2003, Plaintiff's counsel submitted a letter to the Appeals Counsel acknowledging both that "[t]he ALJ denial dated October 31, 2003 notes the claimant requested an on record determination" and that "[t]his was in fact the case discussed with the ALJ on June 16, 2003 (hearing date)." (R. at 283). This letter also confirms that Plaintiff's counsel was aware that a hearing had been scheduled for October 1, 2003. (R. at 283).

The record belies Plaintiff's challenge to the sufficiency of his waiver. Biswas was afforded "meaningful notice and an opportunity to be heard" prior to the denial of his claim for disability benefits as required by due process. *Stoner v. Sec'y of Health and Human Servs.*, 837 F.2d 759, 761 (6th Cir. 1988); *see also McCarthy*, No. 95-CIV-4534 (JBS), 1999 WL 325017, *11. As noted, two notices scheduling hearings were sent to Plaintiff's address. These notices explained the hearing process and Plaintiff's rights in connection therewith. *Cf. McCarthy*, No. 95-CIV-4534(JBS), 1999 WL 325017, *12. There can be no question of Plaintiff's awareness that the two hearing dates had been scheduled in correspondence sent to Plaintiff's address, nor does Plaintiff attempt to so argue, as his attorney and appointed representative appeared before Judge Determan on the initial hearing date and his attorney referenced the second hearing date in correspondence forming part of the record. Nor does Plaintiff make any allegations concerning either his failure to personally appear on the first scheduled date or both his and his counsel's apparent failures to appear on the second scheduled hearing date. Plaintiffs' counsel likewise does not argue that, during his appearance on the June 16, 2003 scheduled hearing date, he ever

19

indicated that his client either did not waive a personal appearance or had not appointed him to appear on his client's behalf.  *Cf. Stoner*, 837 F.2d at 761.  In addition, Plaintiff had already obtained a second hearing date, and there is no indication that he could not have obtained a third in the event he was simply unable to make either of the first two that were scheduled and in fact desired to appear.  *Cf. McCarthy*, No. 95-CIV-4534(JBS), 1999 WL 325017, *12.  Finally, Plaintiff's representative in a signed writing acknowledged Plaintiff's earlier waiver.  (R. at 283).  Accordingly, the surrounding circumstances indicate that Plaintiff's waiver of personal appearance was knowing and voluntary and due process was afforded to him.

However, "where the rights of individuals are affected, an agency must follow its own procedure, even where the internal procedures are more rigorous than otherwise would be required."  *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981).  In this case, the record does not contain a written and signed waiver in the form mandated by SSR 79-19.  "As we are bound by the record, we must assume" that the technical requirements of SSR 79-19 were not met.  *See id*.  However, remand is only required if Biswas was prejudiced as a result of the noncompliance with SSR 79-19.

The record reveals that Biswas did not suffer prejudice necessitating a remand.  Plaintiff appointed as his representative his attorneys, who advocated on his behalf, for example by appearing before the ALJ on the first scheduled hearing date and later submitting a letter brief to the ALJ on Plaintiff's behalf.  (R. at 41-42).  As discussed in detail above, Biswas completed a number of questionnaires pertaining to his medical status and his work history, and as such the ALJ already had before him relevant information for his analysis, diminishing the value of a personal appearance by the Plaintiff.  (R. at 55-95).  Finally, Plaintiff by his own admission was not disabled and had already returned to work by the time of the scheduled hearings, and thus the

utility of the ALJ's observation of Biswas would have been minimal at best.   (R. at 41-42, 283, 284).

Accordingly, Plaintiff's challenge to the ALJ's determination based upon lack of a hearing is without merit.

### B.   Sufficiency of the ALJ's Analysis:  Is the Denial of Benefits Supported by Substantial Evidence?

#### 1.  *The ALJ's Analysis*

ALJ Determan properly followed the sequential evaluation and considered and evaluated all relevant evidence put before him.  The decision clearly incorporates both Biswas' subjective complaints and various medical reports related to his physical well-being.

At step one of the sequential evaluation, ALJ Determan found that Biswas had not engaged in any substantial gainful activity since his alleged onset date.  (R. at 14).  At step two of the sequential evaluation, ALJ Determan determined that Biswas suffered from "severe" impairments.  (R. at 15).  ALJ Determan described these impairments as "status post aortic valve replacement and peripheral vascular disease."  (*Id.*)

ALJ Determan determined at step three that although Plaintiff's impairments were severe, they were "not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4."  (*Id.*)  ALJ Determan noted that he gave special consideration "to the listings in 4.00."  (*Id.*)  The ALJ explained that medical testing did not support a finding that the claimant's condition met the listing level severity and that Biswas lacked "a sufficient record of treatment to establish listing level severity."  (*Id.*)  In reaching his conclusion, the ALJ conducted a review of the medical evidence in the record.  (*Id.*)

21

At step four, ALJ Determan determined that, in light of the objective medial evidence as well as Biswas' representations, Biswas retained residual functional capacity to "perform sedentary work activity which requires lifting and carrying up to ten pounds, standing or walking for two hours and sitting for six hours in an eight-hour workday." (*Id.* at 16).  The ALJ found that the severity and functional effects of the symptoms alleged by Biswas were not fully credible.  (*Id.*).  However, ALJ Determan determined that Biswas could no longer perform his past relevant work as a limousine driver.  (*Id.*).

At step five, ALJ Determan evaluated Biswas' residual functional capacity and vocational profile in conjunction with the Medical Vocational Guidelines of Appendix 2 of Subpart P of the Regulations.  (*Id.* at 16-17).  Ultimately ALJ Determan concluded that the evidence supported "a finding that the claimant can perform the demands of the full range of sedentary work" and, therefore, Biswas was "not disabled."  (*Id.*).

## 2.  *Step Three of the Sequential Evaluation*

After determining that the claimant's condition is severe, at step three of the sequential evaluation the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work.  20 C.F.R. § 404.1520(a)(4)(iii); *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999).  If the claimant's impairment equals a listed impairment, then the claimant is considered "disabled."  *Id.*  Biswas argues that the ALJ "offered no explanation for his finding that plaintiff's impairments are not the medical equivalent of the Commissioner's listings."  (Pltf.'s Br. at 11).  In support, Plaintiff relies on *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000).  The Commissioner counters that the ALJ did not offend *Burnett* and that "the ALJ provided the requisite framework that permits meaningful review."  (Deft.'s Br. at 14).

22

In *Burnett*, the Third Circuit was troubled by the ALJ's summary conclusion that the claimant's impairment did not "meet or is not equivalent to a listed impairment." *Burnett*, 220 F.3d at 120.  The ALJ's entire step three analysis consisted of the following:

> Although Burnett has established that she suffers from a severe musculoskeletal impairment, said impairment failed to equal the level of severity of any disabling condition contained in Appendix 1, Subpart P of Social Security Regulations No. 4.

*Id.* at 119.  The court complained that the ALJ's conclusory statement was "beyond meaningful judicial review." *Id.*  With "no way to review the ALJ's hopelessly inadequate step three ruling, we will vacate and remand the case for a discussion of the evidence and an explanation of reasoning supporting a determination that Burnett's 'severe' impairment does not meet or is not equivalent to a listed impairment." *Id.* at 120.  In a corresponding footnote, the court noted that "[w]hile the burden is on the claimant to present medical findings that show his or her impairment matches a listing or is equal in severity to a listed impairment, it is unclear from the regulations or caselaw (*sic.*) whether a claimant must identify the relevant listing(s)." *Id.* at 120 n.2.  The court went on to suggest it is more consistent to put the latter burden on the ALJ.  *Id.*

The Third Circuit, in subsequent, unpublished opinions, addressed similarly conclusory statements regarding step three and focused on *Burnett*'s language requiring "meaningful judicial review." *Albury v. Comm'r of Soc. Sec.*, No. 03-2151, 2004 WL 1758982 (3d Cir. Aug. 5, 2004); *Caruso v. Comm'r of Soc. Sec.*, No. 03-2709, 2004 WL 1147065 (3d Cir. May 19, 2004); *Maldonado v. Comm'r of Soc. Sec.*, No. 03-2759, 2004 WL 1012185 (3d Cir. May 5, 2004); *Sentyz v. Barnhart*, No. 03-1504, 2003 WL 22956015 (3d Cir. Nov. 13, 2003); *Ballardo v. Barnhart*, No. 02-4124, 2003 WL 21467240 (3d Cir. June 20, 2003).  In *Albury*, the court explained that

> [i]n contrast [to *Burnett*], the ALJ here discussed all of the relevant medical evidence before concluding that Albury was not entitled to disability insurance benefits. Albury argues that the ALJ was required to discuss the applicable Listings in his opinion. While this would have been helpful, and may even be required by Burnett, our primary concern has always been the ability to conduct meaningful judicial review. Because the ALJ's decision in this case allows for such review, any error was harmless because the decision is still supported by substantial evidence, and the ALJ's decision is explained in sufficient detail to allow meaningful review.

2004 WL 1758982, at *2 (citation omitted).  The court also noted that *Burnett* did "not expressly hold that the ALJ must discuss the applicable Listing(s) in his/her decision."  *Id.* at *2 n.2. Similarly, the court in *Caruso* stated that

> *Burnett* does not require an ALJ to use "magic language" or adhere to a particular analytical format. Rather, the purpose of Burnett is to ensure sufficient development of the record and explanation of findings to permit meaningful judicial review. In this case, the ALJ's decision, read as a whole, convinces us that he considered the appropriate factors in reaching the conclusion that Caruso did not meet the criteria of any of the listed impairments described in Appendix 1 of the Regulations.

2004 WL 1147065, at *2.  In *Maldonado*, the court held that "[w]here, as in here, we can determine that substantial evidence supports the ALJ's decision, the 'meaningful judicial review' goal of *Burnett* is satisfied."  2004 WL 1012185, at *3.  Similarly in *Sentyz*, the court held that after consideration of the entire record and "despite the inadequate explanation by the ALJ," there was "substantial evidence to support the ALJ's decision that [the] impairment, though severe, did not satisfy" the listing criteria.  2003 WL 22956015, at * 2.  Lastly, in *Ballardo*, the court also noted that "[b]ecause Ballardo did not meet her burden of production [regarding evidence that her impairment meets or is equivalent to a listed impairment], the ALJ was not required to articulate specific reasons that Ballardo's impairment was not equal in severity to any of the statutorily listed impairments."  2003 WL 21467240, at *1.  Therefore, assuming the

24

claimant satisfies his burden of production so as to obligate the ALJ to articulate his reasons, the meaningful judicial review goal of *Burnett* is satisfied if a review of the entire record is possible even without an articulation of specific listings.

> In the case at hand, the ALJ, before an examination of the evidence, stated:

> > The medical evidence that the claimant has status post aortic valve replacement and peripheral vascular disease, impairments that are severe within the meaning of the Regulations but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.   Special consideration has been given to the listings in 4.00.   However, EKG and other testing does not support a finding that the claimant's condition meets lisitng (sic.) level severity.   Moreover, the claimant does not have a sufficient record of treatment to establish listing level severity.

(R. at 15).   The ALJ then reviewed the medical evidence.   Plaintiff quoted this same paragraph in support of his claim that the ALJ summarily concluded that Plaintiff did not satisfy step three, but made no reference to the ALJ's review of the medical evidence.   (Pltf.'s Br. at 12). Nevertheless, assuming the ALJ did not articulate his findings in his review of the medical evidence, Plaintiff fails to recognize that the passage quoted above indicates that the Plaintiff failed to satisfy the showings for any listing and specifically those found in Section 4.00.   Section 4.00 delineates the factors and standards for interpreting evidence submitted on disability claims relating to cardiovascular disorders, the very complaints that Plaintiff has made.   The ALJ pointed to the listing of impairments to which he referred, thus satisfying his burden pursuant to step three of the sequential evaluation.

Moreover, the ALJ's conclusion is capable of meaningful review and is supported by substantial evidence.   ALJ Determan developed the record and discussed the medical evidence in connection with his conclusion that Biswas was not disabled.   *See Jones v. Barnhart*, 364 F.3d

25

501, 505 (3d Cir. 2004) ("the function of Burnett is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review").  ALJ Determan recognized that Biswas underwent open heart surgery in September 2001, and that Biswas had underlying medically determinable impairments.  (R. at 15-16).  However, the ALJ also credited the reports of Dr. Roque and Dr. Merlin, discussed below.

ALJ Determan noted that Dr. Roque found that Biswas' heart "sounded good", that his heart showed "a regulor rhythm, with no murmur, gallop or rub noted", that Biswas "denied to the doctor any chest pains or palpitations", and that the "chest x-ray showed only mild cardiomegaly[17] with no inflitrates (*sic*.), pleural effusion or congestive heart failure."  (R. at 15).  The ALJ noted that Dr. Roque determined that Biswas was able to sit, stand, walk and travel and that he only "had functional limitations for activities requiring exertion."  (*Id*.).  With respect to the report issued by Dr. Merlin, the ALJ recounted that Biswas was "well develop[ed], well nourished and in no acute distress."  (*Id*.).  ALJ Determan noted that the report found that the "examination of the heart revealed regular S1, S2."[18]  While the report noted a metallic click, it found "no murmur, gallop or friction rub."  (*Id*.).  Biswas denied any leg swelling, shortness of breath, or history of emergency department visits.  (*Id*.).  Moreover, ALJ Determan took into account Biswas' subjective complaints, but found that "the medical and other evidence establishes that the severity and functional effects of the claimant's alleged symptoms are not

---

[17] "Cardiomegaly" is the medical term for "enlarged heart."  *See* http://my.webmd.com/hw/ heart_disease/tp17534.asp.

[18] "S1" and "S2" refer to sounds made by the heart.  Specifically, **"S1** precedes **S2** and they can be described simply as the basic "lub-dub" sounds."  *See* http://www.paramedic-resource-centre.com/help/heart_sounds.htm.

fully credible."[19]

While the evidence is undisputed that Biswas underwent open heart surgery for the replacement of his aortic valve, the objective medical evidence conflicts with the alleged severity and medical reliability of his condition subsequent to that apparently successful procedure. Accordingly, the ALJ's decision at step three satisfies *Burnett* and is supported by substantial evidence.

### 3. *The Decision that Biswas Could Do Sedentary Work*

After determining that the claimant's impairments do not equal or exceed a listed impairment, the Commissioner focuses on whether the claimant's residual functional capacity sufficiently permits him to resume his past relevant work, and if not, whether the Commissioner has demonstrated that the claimant can perform other substantial, gainful work. 20 C.F.R. § 404.1520(a)(4)(iv)-(v). Biswas argues that the ALJ made a "stark announcement of plaintiff's residual functional capacity which [wa]s accompanied by no articulated basis." (Pltf.'s Br. at 17). The Commissioner counters that the ALJ provided "a comprehensive review of the evidence during the relevant period and provided a reasonable basis for his residual functional capacity assessment." (Deft.'s Br. at 16).

---

[19] ALJ Determan's opinion states that a Functional Assessment Questionnaire ("FAQ") completed by Biswas reported that he was able to do in the same household activities as before his illness and that he is able to do specific activities, such as preparing meals and vacuuming. (R. at 15). Biswas completed more than one FAQ, and they are in fact inconsistent with respect to these issues. In a FAQ dated May 7, 2002, Biswas states he was unable to engage in either category of activity. (R. at 84-85). However, in a FAQ dated February 8, 2002, completed in what appears to be different handwriting, Biswas states that he is able to engage in both types of activity. (R. at 87-88). Because the ALJ expressly did not find fully credible the severity and functional effects of Biswas' alleged symptoms in light of the medical and other evidence, this inconsistency is of no consequence here.

27

In performing his analysis, the ALJ reviewed the medical evidence as well as Biswas' subjective complaints before concluding:

> Although the claimant did have a severe impairment, the medical evidence as discussed above does not support a finding that he was unable to work. Accordingly, the undersigned finds the claimant retains the following residual functional capacity: perform sedentary work activity which requires lifting and carrying up to ten pounds, standing or walking for two hours and sitting for six hours is an eight-hour workday.

(R. at 16).  Plaintiff questions "what evidence leads the ALJ to such a conclusion ." (Pltf.'s Br. at 18).  The ALJ in his opinion indicates that he relied on the reports by Dr. Roque and Dr. Merlin discussed *supra*.  (R. at 15).  Moreover, the ALJ states that he considered Biswas' subjective complaints and did not fully credit them.  (R. at 16).

As the Court has already described in detail both the reports by Dr. Roque and Dr. Merlin as well as the ALJ's review of these reports, it will not do so again.  In sum, both doctors reported that Biswas' medical condition, aside from itching at the site of his chest scar, was essentially unremarkable.  (R. at 239-41, 245-47).  The only functional limitations mentioned by either doctor were for activities requiring exertion.  (R. at 241).  Dr. Roque noted that Biswas "appears capable of performing activities of daily living and instrumental activities of daily living."  (R. at 241).  In assessing Biswas' ability to do work related activities, Dr. Merlin noted that Biswas "is able to sit, stand, walk, handle objects, hear, speak, [and] travel", which is consistent with Dr. Roque's analysis.  (R. at 241. 246-7) (Dr. Roque mentions reading and writing and does not mention handling objects)).  The ALJ's decision that Biswas was capable of sedentary work is, therefore, firmly grounded in the objective medical evidence.

Notably, the findings of the state agency physicians who conducted the residual

28

functional capacity review, discussed *supra*, are supported by Dr. Roque's and Dr. Merlin's conclusions, and may therefore be accorded appropriate weight.  20 C.F.R. § 404.1527(f); SSR 96-6p; *Alexander v. Shalala*, 927 F. Supp. 785, 795 (D.N.J. 1995), *aff'd* 85 F.3d 611 (3d Cir. 1996) (table); (R. at 251-58).  The limitations recommended by the state agency physicians are consistent with the limitation on activities requiring exertion recommended by Dr. Roque, and included that the maximum weights that Biswas should lift frequently and occasionally were 10 and 20 pounds respectively, that Biswas should only occasionally climb, that his ability to reach in all directions was limited, and that he should avoid exposure to extreme cold.  (R. at 252).  The state agency physicians concluded that his capacities were otherwise unlimited.  (R. at 251-58).

Finally, ALJ Determan also appropriately addressed Biswas' subjective complaints of pain.  The ALJ is required to give serious consideration to the claimant's subjective complaints, even though those assertions are not fully confirmed by the objective medical evidence.  *Welch v. Heckler*, 808 F.2d 264, 270 (3d Cir. 986).  However, the ALJ is not bound to accept unquestioningly the credibility of such subjective evidence.  *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).  When evaluating a claimant's condition, subjective complaints of pain "do not in themselves constitute disability."  *Green v. Schewiker*, 749 F.2d 1066, 100 (3d Cir. 1984).  They must be accompanied by medical signs and laboratory findings that show that the claimant has a medical impairment which could reasonably be expected to produce the pain or other symptoms alleged.  *Bittel v. Richardson*, 441 F.2d 1193, 1195 (3d Cir. 1971); 20 C.F.R. 4041529(b).  In accordance with these principles, the ALJ found Biswas' subjective complaints "not fully credible."  (R. at 16).  The ALJ reached this conclusion after reviewing the medical evidence discussed above as well as Biswas' FAQ.  The ALJ recounted that Biswas' FAQ indicated that

29

Biswas had chest discomfort lasting for 10 to 15 minutes, but that he did not have shortness of breath. (R. at 15). The ALJ also noted that while Biswas took heart medication, Biswas reported that the medications did not cause any significant side effects. (R. at 15). Finally, the ALJ noted that Biswas reported that he could undertake "the same household activities he did before his illness and that he is able to prepare meals, shop, vacuum and take out the garbage." (R. at 15). Considering the FAQ in conjunction with the medical evidence discussed above, the ALJ's decision regarding the credibility of Biswas' subjective complaints was within his discretion. *LaCorte v. Bowen*, 678 F. Supp. 80, 83 (D.N.J. 1988).

Accordingly, ALJ Determan's conclusion that Biswas could engage in the full range of sedentary work is supported by substantial evidence.

Finally, despite Plaintiff's intimations to the contrary (Pltf.'s Br. at 18-19), ALJ Determan plainly was aware that Biswas underwent open heart surgery. (R. at 15). Plaintiff's assertions to the contrary, an ALJ is not required to set forth what he believes to be a proper rehabilitation and recovery period for open heart surgery. It is the claimant's burden to prove that he or she had an impairment that lasted or was expected to last for a continuous period of not less than twelve months. *See, e.g., Gifford v. Barnhart*, 04-CIV-2308, 2005 WL 995511, at *1 (3d Cir. 2005); *see also* 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382a(3)(A). ALJ Determan's decision necessarily entails the conclusion that Biswas did not prove that he had an impairment that lasted or was expected to last for a continuous period of not less than twelve months. (R. at 13-18). Even assuming *arguendo* that Biswas had an impairment satisfying the standard in the weeks or even months surrounding his surgery, he still cannot prevail because, as discussed *supra*, substantial evidence supports the ALJ's conclusion that he did not suffer from an impairment meeting or equaling a listed impairment for the requisite time period.

30

## V.  CONCLUSION

For the foregoing reasons, the Court concludes that substantial evidence supports the

ALJ's factual findings and thus affirms the Commissioner's final decision denying benefits for

Plaintiff.  An appropriate order follows.


s/ Joel A. Pisano

HON. JOEL A. PISANO, U.S.D.J.

Orig:   Clerk
cc:     All parties
        File